# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| EGG WORKS, INC., | |
|     Plaintiff, | Case No. 2:10-cv-1013-LDG (RJJ) |
| v. | **ORDER** |
| EGG WORLD, LLC, *et al.*, | |
|     Defendants. | |

    The plaintiffs–Egg Works, Inc.; Egg Works 2, LLC.; and Bradley Burdsall (collectively Egg Works)–seek a preliminary injunction against the defendants–Egg World, LLC, Gabrijel Krstanovic, and Dejan Debeljak (collectively Egg World). The court held an evidentiary hearing on this matter. The parties have also filed briefs and supplemental briefs, as well as declarations. Having considered the record and the arguments of the parties, the court will deny the motion.

    <u>Brief Factual Background</u>

    Burdsall purchased and operates the Egg and I restaurant located at 4533 West Sahara Avenue. In 2005, he expanded his business to include a restaurant named Egg Works at 9355 West Flamingo Road (which is owned and operated by Egg Works, Inc.) and an additional restaurant named Egg Works at 2490 Sunset Road (which is owned and

operated by Egg Works 2, LLC).  Burdsall obtained a trademark for the EGG WORKS word mark and a trademark for the EGG WORKS stylized mark.  The stylized mark includes a depiction of a male and a female character arm-in-arm, each being egg-shaped and having eyes, mouth, arms, and legs.  The text is capital letters in a font using rounded corners.  The exterior sign for the Flamingo Egg Works consists of two pairs of the egg-characters on each side of the words "EGG WORKS."  The text is in capital letters, is yellow, and uses a font with rounded corners.  The egg-characters are white with slight shading.  The building's brown exterior serves as the background to the text and characters.

Egg World owns and operates a restaurant named Egg World at 7906 West Sahara Avenue.  Prior to its opening, the exterior signs for the Egg World restaurant displayed "EGG WORLD" in yellow, capital letters, using a font with squared corners, and "BREAKFAST & LUNCH" in dark blue, capital letters, using the same font, directly under "EGG WORLD."  At each end of the text was a face, displaying only eyes and a mouth, in the shape of an egg.  The egg-face to the right had long eye-lashes.  The egg-faces were colored yellow, and slightly overlapped the first and last letters of EGG WORLD.  Each of the exterior signs had a light blue background.

On June 1, Egg Works' attorney sent Egg World a letter asserting that Egg World's use of the term Egg World, using the same color and lettering design, along with male and female egg characters, infringed Burdsall's trademarks.  Egg Works demanded that defendants change the word "World," change the style and color of lettering, and remove the male and female egg characters.

In response, Egg World replaced its exterior signs with new signs that did not have the egg-shaped faces, that increased the size of EGG WORLD text, but that are otherwise the same as the original sign.

The wait-staff at Egg Works wear black t-shirts with an Egg Works logo (the arm-in-arm egg-characters above "EGG" above "WORKS" above "LAS VEGAS") on the left

2

breast. The wait-staff at Egg World wear t-shirts of different colors, including a black t-shirt, without any logo on the front. Centered on the back of the t-shirts, from side-to-side, the shirts display two egg-faces above "EGGWORLD" (spaced as a single word) above "BREAKFAST & LUNCH" above "LAS VEGAS, NV."

Egg Works uses a wide, yellow mug with vertical sides. Opposite the handle, extending from top to bottom, the mug is printed with (a) "Start Your Day With Las Vegas' Best Breakfast" in black letters; (b) "EGG WORKS" in black with a wide white outline next to the arm-in-arm egg characters in white with black outline; and (c) "eggworks@eggworks.com" next to the names of two Las Vegas newspapers, all in black letters. Egg World uses a yellow mug that is taller and increasingly widens from bottom to top. Ninety degrees to the handle, in the center, the mug is printed with (a) two egg-faces in black outline above (b) EGGWORLD, spaced as a single word, in black outline, above (c) BREAKFAST & LUNCH in black lettering.

Plaintiffs' Burden to Obtain a Preliminary Injunction

The plaintiffs must show that (a) they are likely to succeed on the merits, (b) they are likely to suffer irreparable harm, (c) the balance of equities tips in their favor, and (d) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, __ U.S. __, 129 S.Ct. 365, 374 (2008).

Plaintiffs' Burden to Show Trademark Infringement

As recently summarized by the Ninth Circuit:

> The Lanham Act creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition. 15 U.S.C. § 1051 *et seq.* To prove infringement, a trademark holder must show that the defendant's use of its trademark "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1125(a)(1)-(a)(1)(A). Protecting against a likelihood of confusion–what we have called the "core element of trademark infringement," *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) (quotation marks omitted)–comports with the underlying purposes of trademark law: "[1] ensuring that owners of trademarks can benefit from the goodwill associated with their marks and [2] that consumers can distinguish

among competing producers." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002).

Eight factors, sometimes referred to as the *Sleekcraft* factors, guide the inquiry into whether a defendant's use of a mark is likely to confuse consumers: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). This eight-factor analysis is "pliant," illustrative rather than exhaustive, and best understood as simply providing helpful guideposts. *Brookfield Commc'ns*, 174 F.3d at 1054; *see E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) ("This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive."). The *Sleekcraft* factors are not a scorecard, a bean-counter, or a checklist. *Thane*, 305 F.3d at 901. "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns*, 174 F.3d at 1054.

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt,* __ F.3d __, 2010 WL 3258703, at *2 (9th Cir. 2010).

<u>Strength of the Plaintiff's Mark</u>

Egg Works begins its analysis of the Sleekcraft factors by arguing that its mark is conceptually suggestive and thus strong. The stronger a mark, the greater protection it receives. *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1207 (9th Cir. 2000). Its strength is evaluated conceptually and commercially. *Id.* "Marks can be conceptually classified along a spectrum of increasing inherent distinctiveness. From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id.*, (internal citations omitted). As noted in *Fortune Dynamic*, "[c]ategorizing trademarks is necessarily an imperfect science." Nevertheless,

"A suitable starting place" for attempting to draw the line between a suggestive and a descriptive mark "is the dictionary." Zatarains, [Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 792 (5th Cir. 1983), overruled in part by *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 116 (2004) (" KP Permanent I ")], see also *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1015 n.11 (9th Cir.1979) ("While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public...."). With that in mind, two tests help distinguish between a descriptive and a suggestive

4

mark. First, a mark is more likely suggestive if it passes the imagination test, which asks whether the mark "requires a mental leap from the mark to the product." *Brookfield Commc'ns*, 174 F.3d at 1058; see also 2 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 11:71 (4th ed. 2004) ("MCCARTHY") ("Is some reflection or multistage reasoning process necessary to cull some direct information about the product from the term used as a mark?"). "[T]he imagination test is [the] primary criterion for evaluating" whether a mark is suggestive. *Zobmondo* [*Entm't, LLC v. Falls Media, LLC,* 602 F.3d 1108, 1116 (9th Cir. 2010)], (quotation marks omitted). Second, a mark is more likely suggestive if it passes the competitor test, which asks whether "the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods." Id. at 1117 (quotation marks omitted); MCCARTHY § 11:68.

*Fortune Dynamic,* at *6. "Merely descriptive marks need not describe the essential nature of a product; it is enough that the mark describe some aspect of the product." *Zobmondo*, 602 F.2d at 1116 (internal quotation marks omitted).

Egg Works asserts, without any citation to any definition, that its mark does not directly convey any feature or characteristic of its services to consumers. The entire mark is "Egg Works." As established by Egg Works menu, eggs are a staple of many breakfast dishes. The use of egg indicates the mark is descriptive. Further, as defined in Webster's New International Dictionary, "works" is "a place where industrial labor of any kind is carried on," and is often used in a combination such as gasworks, steelworks, and boilerworks. While Egg Works does not describe a place where *industrial* labor related to eggs is carried on, the combination "egg works" requires little imagination to recognize that Egg Works prepares and serves egg dishes to its consumers, an aspect of Egg Works service. Further, "the works" is defined as "everything, especially everything possible or at one's command." As stated in Egg Works menu in describing its "The Works Omellete:" "This one is loaded!!!" While Egg Works may not serve every egg dish, "egg works" could be considered as "nothing more than self-laudatory advertising." *Fortune Dynamic.* As a descriptive mark, Egg Works is not entitled to protection absent a showing of secondary meaning. Egg Works has not expressly addressed whether it has shown that its mark has obtained a secondary meaning.

5

While Egg Works has shown that it has expended resources on advertising, and that it has received positive media attention, the descriptive nature of the mark indicates that this factor is likely to weigh in favor of defendants.

<u>Actual Confusion</u>

From the outset, Egg Works has relied heavily on its argument of actual confusion. Prior to the hearing, Egg Works submitted numerous declarations of consumers. At the hearing, Egg Works called consumers as its first three witnesses. In considering actual confusion, the Court acknowledges that trademark law protects the plaintiff's mark from infringement from the defendant's use of its mark. It is not enough, however, that a consumer is confused. The confusion must arise from the defendant's use of its mark and not from some other source.

The Ninth Circuit's discussion of survey evidence in *Fortune Dynamic* places into focus this critical distinction between relevant confusion (caused by the defendant's use of a confusingly similar mark) and non-revelant confusion (caused by something other than the defendant's use of the mark). In *Fortune Dynamics*, the plaintiff alleged that defendant's display of the word "Delicious" on a tank top infringed its "Delicious" trademark for footwear. The plaintiff's expert conducted a survey of two groups. In the test group, each person was shown a picture of the plaintiff's product and the defendant's product displaying the word "Delicious," and asked a series of questions as to the source of the products. The results caused the expert to conclude that 54% of the test group expressed confusion. A similar test was conducted on a control group. For the control group, however, the defendant's product did not show the word "Delicious," but instead displayed either "Beautiful," "Fabulous," or "Incredible." The results of this control group caused the expert to conclude that 43% of the control group expressed confusion. Thus, although the control group was shown a word that was dissimilar and could not infringe the plaintiff's mark, 43% of the control group nevertheless were confused.

1   As the control group had not seen the defendant's mark, their confusion could not
2   have resulted from the mark.  Further, the finding that 43% of the control group were
3   confused indicated that a substantial portion of the test group who were confused were
4   confused for the same reasons causing confusion for the control group.  Stated otherwise,
5   the evidence of actual confusion was not that 54% of the test group was confused, but that
6   11% more people in the test group were confused as compared to the control group.

   In the present matter, the evidence presented by Egg Works reveals that a
   substantial number of consumers expressed a non-relevant confusion; confusion that
   resulted from something other than Egg World's mark.  Initially, the court would note the
   declarations submitted by Egg Works to show actual confusion:

Ginalalabrigiday Chase:[1]
> As we were driving down Sahara we witnessed a gentleman with a yellow sign that caught our eye that said Egg World.  We were looking for "Egg and I" – And realized that we got confused and went to the wrong place.

Kay Stout:
> I, Kay Stout is the original owner of "The Egg & I".  I sold the Egg + I approx 9 yrs ago to Brad Burdsall.  He has made the Egg & I very successful with a lot of hard work.
> I was driving by the Egg & I and came to this restaurant called "Egg World.  It looked so much like the Egg & I, I stopped in, same menu, and I asked if this was part of the Egg & I, they no.  So I immediately left.

Phyllis Seipel:
> I went by a restaurant that looked like the one that I go to routinely.  I stopped, went in, & noticed some similarities to the other restaurant.  I ate, left, then checked with my "familiar" restaurant, the Egg & I, to see if they had a new location I didn't know about.  I was a bit confused by the other place, thinking it seemed somewhat similar, but I was told there was no new location called Egg World.

Michael Camardella:
> After leaving doctors appt we were driving down Sahara looking for the Egg and I which we come to often – We were a little distracted and saw a sign holder advertising eggs.  We pulled in thinking it was the egg and I and turned out it was egg world.  We just left and went down the street to our favorite breakfast establishment laughing at our mistake.  I am sure this

---

[1] The Court has endeavored to quote each declaration as originally written.

>happens all the time and wonder how many do not realize that its not the egg and I.

Denise Rodgers:
>On June 15th I took a class to Egg and I for a field trip. When I got there I pick up the menu to see what they had. On the front of the Egg & I menu it listed all the location but I thought they were missing a location because I remembered seeing Egg World a few days prior just up the street.

While the court agrees that these consumers are expressing confusion, their statements also establish that they are expressing a non-relevant confusion. Although the plaintiffs brought this action and motion to protect Egg Works' mark, and though none of the above quoted declarants were subjected to cross-examination, each expressed confusion concerning the Egg & I. As Egg Works acknowledged and argued, this matter does not concern the Egg & I. Egg Works has neither alleged nor argued that Egg World has infringed any mark of the Egg & I. Further, the record lacks any evidence or suggestion of similarity between the marks of Egg & I and Egg World. Accepting that these declarants were confused, and given that the declarants expressed a confusion as to the Egg & I, the consumers' confusion cannot be attributed to defendant's use of a trademark confusingly similar to Egg Works' trademark.

The record contains evidence that strongly indicates that the source of the consumers' non-relevant confusion is the close affiliation between the Egg & I and Egg Works. Burdsall's testimony consistently treated all three restaurants as a unit, and rarely distinguished between the Egg & I restaurant and the Egg Works restaurants. The evidence before the court also indicates that the plaintiffs and the Egg & I actively cross-promote the close relationship between Egg Works and the Egg & I. The Egg Works menu displays, on its front page, the location of the Egg & I restaurant. Rodgers' declaration, cited previously, strongly suggests that the Egg and I also lists the location of the Egg Works restaurants on its menu.

As further established by many of the declarations, and the testimony of each of the consumer witnesses, the plaintiffs have succeeded in educating their consumers of the close affiliation between the Egg & I and the Egg Works restaurants. Steipal and Bormann, who each testified at the hearing, indicated their knowledge that Burdsall was the the common nexus between Egg Works and the Egg & I. Steipal, though only a consumer, knew that Burdsall had purchased the Egg & I, and then opened new restaurants under the Egg Works name and mark. Egg Works' first witness at the evidentiary hearing also acknowledged his awareness of the relationship between the Egg & I and Egg Works.

The statements of numerous other declarants, submitted by Egg Works, reveal that a substantial number of the declarant consumers know of the relationship between the Egg & I and Egg Works.

John C. Wickman:
> As I was driving down W. Sahara toward Rainbow after visiting my dentist on 7-13-10 I notice a man waving a sign showing a grand opening. As I glanced I saw Egg World and in looking a little closer I thought it was part of the Egg & I or Egg Works which we eat at quite often. Needless to say I was confused thinking that they were all one in the same.

Mark Pardy:
> The logo + sign for Eggworld is so similar to that of Egg Works/The Egg & I, that I thought it was a new restaurant owned by Mr. Burdsall. I was aware that Brad was planning on opening a new restaurant so I stopped to see it. While it's different inside, there seems to be a confusion in corporate identity due to the signage.

Ramin Nahoraof:
> I have frequently eaten breakfast at the Egg & I/Egg Works over the years. When I 1st read an advertisement about Egg World opening up in Summerlin I assumed it was under the ownership/association of Egg and I/Egg Works. I was surprised to hear that it wasn't. Egg World had a similar name and similar mascots/logos (His/her Eggs). I was easily confused as to who Egg World was, originally believing it belonged to the Egg & I/Egg Works company.

Elizabeth A. Jones:
> When I drove past the new Egg World on West Sahara my first thought was has the Egg & I/Egg Works opened another branch of their restaurant? When we next went to the Egg & I was asked about it and were told that they were in no way part of their group. The name alone very

      deceiving and will make most regular customers of the Egg & I/The Egg Works they are part of the same group.

Shawna Hope:
      As we were driving down Sahara we saw Egg World and thought for sure that it was a new Egg Works or Egg and I. The sign is very misleading and the restaurant appeared to be just like all of the other Egg Works chains.

Megan Gross:
      I was driving down Sahara and I came across Egg World. My friend and I thought it was a new chain of "Egg & I" and "Egg Works" which we are big fans of. So we pulled in to have breakfast. The style and decor even looked similar to the Egg and I. We saw that it was close (grand opening is not until the 12th). We continued on Sahara to the Egg and I that we new was down the street.

Kimberly Harper:
      I drove by Egg World on the way to work & noticed the guy out front waving a sign. As a longtime customer of Egg Works & Egg & I, I thought it odd they would open another location so close to the others. I questioned staff while dining at Egg Works and was assured it was not their new location.

While each of these declarants reveal their knowledge of the relationship between the Egg & I and Egg Works, they also reveal that this relationship is the source of their confusion. Each of the declarants quantify the relationship between the Egg & I and Egg Works as being a chain or group of restaurants. Each states a confusion whether Egg World was owned by or part of the Egg & I and Egg Works chain or group of restaurants.

      Based upon this belief, these consumers express a non-relevant confusion that Egg World was being opened as part of the chain or group of restaurants that includes Egg Works and Egg & I. Stated otherwise, the plaintiffs' marketing successfully informed their consumers that they operated three breakfast and lunch restaurants under two dissimilar names that included the word "egg." The consumers, so educated, submitted declarations expressing confusion whether the plaintiffs opened (or were opening) a fourth breakfast and lunch restaurant using a third name that included the word "egg."

      The Court recognizes that many of the declarations submitted by Egg Works do not reference the Egg & I. It may be possible that some of these consumers were unaware of

the relationship between the Egg & I and Egg Works, and thus were not confused by that relationship.  Such a possibility, however, is speculative on the record presented to the court by Egg Works.  First, the Egg Works menu advertised its relationship to the Egg & I, and the totality of the evidence suggests that the plaintiffs promoted this relationship.  Second, Egg Works did not offer any evidence that some of its consumers were aware of Egg Works but were not aware of its relationship to the Egg & I.

   Further, given the substantial number of consumers whose declarations reveal non-relevant confusion, the lack of any cross-examination of the remaining consumer declarations precludes the Court from giving any weight to the declarations of the remaining consumers who did not reference the Egg & I in their statements.  For example, Egg Works offers the declaration of Sue Mefford, who states: "The logo was so similar to the Egg Works that I was thinking it was one of the same restaurants."  Though Sue's declaration references only Egg Works, her declaration is not the only evidence indicating the source of her confusion.  Egg Works also submitted the declaration of James Mefford, who resides at the same location as Sue.  James states: "The logo for the Egg World is so similar to the Egg Works & Egg & I that we thought that it was another one of the same group of restraunts."  James' declaration suggests that Sue has a knowledge of the Egg & I, and its relationship to Egg Works.  While Sue might have distinguished between Egg Works and Egg & I, she might have also suffered the same confusion as James, whose confusion concerned the Egg & I and Egg Works as a group of restaurants.

   Having considered the totality of the evidence, including the declarations of a substantial number of consumers expressing non-relevant confusion, the Court finds that Egg Works is not likely to succeed in showing that this factor weighs in their favor.  Rather, the record before the court suggests that this factor weighs in favor of the defendants.

11

Similarity of the Marks

As noted by Egg Works, the spelling of "Egg Works" and "Egg World" is similar, with the only distinction being in the last two letters. In sound, both marks are similar. Both parties also consistently display their marks in capital letters. The exterior signs for both Egg Works and Egg World display their marks in yellow.

Conversely, Egg World consistently displays "EGG WORLD" using a sharp-cornered font, and Egg Works consistently displays "EGG WORKS" using a round-cornered font. The background for the text in Egg Works' exterior sign is the brown exterior of the building. The background for the text in Egg World's exterior sign is a light blue that is part of the sign. Egg Works' exterior sign displays two pairs of its egg-characters. Egg Worlds' exterior signs include the text "BREAKFAST & LUNCH" in dark blue letters.[2] On its mug, Egg Works displays its mark in black with a wide white border. Egg World displays its mark on its mug with a thin black border, causing the yellow color of the mug to also be the color of the text. While only two letters distinguish the spelling of "works" from "world," Egg Works has not suggested that the words have the same meaning.

In considering the weight to be given to similarity of the marks, the Court again notes the declaration of Camardella:

> After leaving doctors appt we were driving down Sahara looking for the Egg and I which we come to often – we were a little distracted and saw a sign holder advertising eggs. We pulled in thinking it was the Egg and I and turned out it was Egg World.

Egg Works disclaimed EGG apart from the mark. Nevertheless, in support of its motion, Egg Works submitted a declaration showing a consumer's reliance upon only the "egg"

---

[2] Both in its motion and in the hearing, Egg Works continues to refer to and rely upon Egg World's first exterior sign, which Egg World altered prior to opening for business. Egg Works, however, seeks a preliminary injunction to require Egg World to change its present conduct. Accordingly, Egg World's first sign is not relevant to whether Egg World's present conduct involves a mark similar to the Egg Works' mark.

portion of Egg World's mark, and further showing the consumer related egg to the Egg and I, which is not Egg Works' mark. The consumer's reliance upon the disclaimed "egg" in relation to an entity that is not before the court suggests that little weight can be given to the similarity caused by the fact that both "Egg Works" and "Egg World" begin with the descriptive word "egg."

Finally, in meaning and definition, "Egg World" and "Egg Works" are dissimilar.

The Court is mindful that similarities are given greater weight than differences, and has accorded greater weight to the similarities. That greater weight, however, is sufficient only to lead the court to conclude that Egg Works is as likely to succeed as it is likely to fail in showing that this factor weighs in its favor. The factor weighs in favor of neither Egg Works nor Egg World.

<u>Proximity or Relatedness of Services</u>

Both parties operate restaurants serving only breakfast and lunch. The closest Egg Works restaurant to the Egg World restaurant is about four miles. This factor favors Egg Works.

<u>Defendant's Intent in Selecting the Mark</u>

Egg Works asserts that Egg World's continued use of a confusingly similar mark after receiving knowledge of Egg Works mark indicates an intent to deceive. In support, Egg Works offers evidence that Egg World became aware of Egg Works' mark when Egg Works' counsel sent a letter to Egg World.

Egg World responds with testimony that Egg World was used as the name of a family restaurant that operated in the 1970s, and was chosen in deference to the prior restaurant.

In considering intent, the Court is also mindful that the conceptual strength of both "Egg Works" and "Egg World" strongly indicates that both are descriptive rather than suggestive.

13

The Court finds that, upon the evidence submitted at this time, this factor does not weigh in favor of either Egg Works or Egg World. As such, it does not show a likelihood of success on the merits.

### Marketing Channels Used.

The Court will not give any weight to this factor. The only overlap of any significance identified by Egg Works is that both restaurants use exterior signs. As the nearest Egg Works restaurant is located more than four miles from Egg World, this "marketing channel" does little to suggest that confusion is likely to result from defendant's use of its mark.

### Likelihood of Expansion into other Markets

Both parties assert a desire to expand beyond the Las Vegas market. Neither, however, presented evidence indicating any such expansion is likely to occur before the merits of this matter can be tried. That this factor is neutral weighs in favor of defendants, as this matter is before the Court on a motion for a preliminary injunction. Nevertheless, the Court has accorded this factor very little weight in the overall balance.

### Degree of Care Likely Exercised by Consumers.

The evidence is, again, equivocal on this factor. Some of Egg Works' consumers, as revealed by their declarations, exercised so little care that they were initially confused by seeing the word egg on Egg World's sign. Further, as noted above, the evidence of actual confusion indicates confusion caused by plaintiffs' operation of three restaurants using two names.

### Likelihood of Confusion

Having considered and given due weight to each of the *Sleekcraft* factors, the court finds that Egg Works is not likely to succeed on the merits of showing a likelihood of confusion caused by defendant's use of its mark.

14

Remaining Preliminary Injunction Factors

As the Court has concluded that Egg Works is not likely to succeed on the merits in showing a likelihood of confusion, the Court concludes Egg Works has not shown a likelihood of irreparable harm. *Cf. Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n.3 (a presumption of irreparable harm arises from showing a likelihood of confusion). Egg Works has the greater investment in promoting its mark. The cost to Egg World to alter its exterior signs (and perhaps replace mugs and uniforms) is not significant, though it may present a greater burden upon a newly-opened restaurant. While the balance of the equities tends to favor Egg Works, it does not outweigh the Court's conclusion that Egg Works is not likely to succeed in showing a likelihood of confusion. Public interest favors neither Egg Works nor Egg World. While trademark law protects trademarks, Egg Works seeks the protection for a mark that is likely to be found as descriptive, and thus weak. Conversely, public interest also favors competition. In sum, the Court finds that a preliminary injunction is not warranted.

Unfair Competition

For essentially the same reasons, the court finds that Egg Works is not likely to show that defendants' conduct in operating their restaurant constitutes unfair competition. In its moving papers, Egg Works focuses upon the similarities in name, exterior signs, uniforms, and mugs. In its first cease and desist letter to Egg World, Egg Works sought a change in name, and the font and coloring of the text on the exterior sign. (Egg Works also sought removal of the egg-face characters from the exterior sign, which subsequently occurred). Egg Works also noted, as it did during the evidentiary hearing, that it had no objection to Egg World opening and operating a breakfast and lunch restaurant.

While Egg World uses black t-shirts for its uniforms, its logo is displayed on the back. Egg World also offered testimony that it does not exclusively use black t-shirts, but uses other colors. That Egg World uses mugs is unsurprising as it serves breakfast. A

15

comparison of photos of both mugs reveals that the style of Egg Works' and Egg World's mugs is dissimilar. The color of the mugs is similar. While both parties have printed material on the mugs advertising the name of the restaurant, the style and nature of the other printed material is dissimilar.

Accordingly, for good cause shown,

THE COURT **ORDERS** that Plaintiffs' Motion for Preliminary Injunction (## 6, 56) is DENIED.

DATED this 14 day of September, 2010.

_____
Lloyd D. George
United States District Judge

16